# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Brian N. Davis, Respondent.

Appellate Case No. 2014-002431

Opinion No. 27480
Submitted November 19, 2014 – Filed January 21, 2015

## DISBARRED

Lesley M. Coggiola, Disciplinary Counsel, and Barbara
M. Seymour, Deputy Disciplinary Counsel, both of
Columbia, for Office of Disciplinary Counsel.

J. Steedley Bogan, Esquire, of Bogan Law Firm of
Columbia, for respondent.

**PER CURIAM:**   In this attorney disciplinary matter, the Office of Disciplinary
Counsel (ODC) and respondent have entered into an Agreement for Discipline by
Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary
Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court
Rules (SCACR).  In the Agreement, respondent admits misconduct and consents to
disbarment with conditions.  Respondent requests that the disbarment be imposed
retroactively to August 12, 2013, the date of his interim suspension.  In the Matter
of Davis, 405 S.C. 65, 747 S.E.2d 434 (2013).  We accept the Agreement and
disbar respondent from the practice of law in this state with conditions as set forth
hereafter in this opinion.  The disbarment shall not be imposed retroactively.  The
facts, as set forth in the Agreement, are as follows.

# Facts

## A. Fraudulent Title Commitments and Title Insurance Policies

### Matter I

Respondent's law practice included conducting residential real estate loan closings. In 2007, Chicago Title Company (Chicago Title) canceled respondent's title agency. From that point, respondent had approved attorney status and issued title commitments and polices through the title agency of his father who is a lawyer. In 2011, when Chicago Title learned of irregularities in some of respondent's closings, it canceled respondent's approved attorney status. From 2011 until his interim suspension in 2013, respondent continued to issue title commitments and policies using the Chicago Title name. Respondent altered Chicago Title's form documents to make it appear as though the company was issuing policies on his closings. At his closings, respondent also collected funds for the purpose of paying title insurance premiums, which he never paid. Respondent's misconduct left lenders and owners without title insurance and some lenders and owners sustained losses as a result of respondent's misappropriation of funds.

In addition to the matters set forth in Part B below, respondent collected money for title insurance that he did not properly pay to Chicago Title in closings for Client AA, Client BB, Client CC, Client DD, Client EE, and Client FF.

### Matter II

Respondent's law firm was licensed as a title agency by Commonwealth Land Title Company (Commonwealth). In 2008, respondent issued title commitments to a lender in connection with two closings. At those closings, respondent collected title insurance premiums, but he neither tendered payment to Commonwealth nor issued the policies to the lender.

Commonwealth canceled respondent's title agency in January 2011. After January 2011, respondent continued to issue title commitments to lenders in connection with closings without authority from Commonwealth. At the closings, respondent collected funds for the purposes of paying title insurance premiums which he did not pay. In June 2013, a lender contacted Commonwealth with a demand for final

title policies. After several emails from Commonwealth, respondent delivered the premiums and Commonwealth issued the policies.

## B. Misappropriation of Funds from Trust

### Matter I

Sometime in December 2012, respondent disbursed funds in connection with a real estate closing prior to receipt of loan proceeds. Ultimately, the loan did not fund. For the next three and a half years, respondent engaged in a pattern of paying off his clients' existing mortgages with proceeds from subsequent, unrelated closings. Because respondent failed to maintain records of financial transactions required by Rule 417, SCACR, ODC is unable to determine the extent of the misappropriation, except as set forth below.

### Matter II

On February 23, 2012, respondent conducted a closing on a refinance transaction for Client A. The lender wired the loan proceeds into respondent's trust account for disbursement on February 28, 2012. However, respondent had already negotiated a check payable to his law firm in the amount of $1,353.00 for attorney's fees and title insurance premiums on February 17, 2012, more than a week before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $803.00 for lender's title insurance, however, respondent did not issue a title policy. Commonwealth issued a policy upon receipt of payment from respondent in June 2013.

### Matter III

On February 24, 2012, respondent conducted a closing on a refinance transaction for Client B. The lender wired the loan proceeds into respondent's trust account for disbursement on February 28, 2012. However, respondent had already negotiated a check payable to his law firm in the amount of $1,101.00 for attorney's fees and title insurance premiums on February 16, 2012, more than a week before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $551.00 for lender's title insurance, however, respondent did

not issue a title policy. Commonwealth issued a policy upon receipt of payment from respondent in June 2013.

## Matter IV

On August 6, 2012, respondent conducted a closing on a refinance transaction for Client C. On August 10, 2012, the lender wired the loan proceeds into respondent's trust account. However, respondent had already negotiated a check payable to his law firm in the amount of $1,297.10 for attorney's fees and title insurance premiums on July 12, 2012, one month before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $747.10 for lender's title insurance, however, respondent did not issue a title policy.

On September 7, 2012, respondent issued a check payable to his law firm from his trust account in the amount of $1,110.00 and deposited it into his operating account. On the memo line, respondent attributed the check to fees for the Client C closing. Respondent was not entitled to any additional funds from the Client C closing at the time he negotiated this check.

## Matter V

On August 31, 2012, respondent conducted a closing on a purchase of real estate for Client D. Respondent deposited funds brought to the closing and the lender wired the loan proceeds into respondent's trust account on the day of closing. However, respondent had already negotiated a check payable to his law firm in the amount of $1,549.30 for attorney's fees and title insurance premiums on July 18, 2012, more than one month before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $679.30 for lender's title insurance, however, respondent did not issue a title policy.

## Matter VI

On September 12, 2012, respondent conducted a closing on a refinance transaction for Client E. Respondent deposited funds brought to closing by Client E on the same day. The lender wired the loan proceeds into respondent's trust account on

September 14, 2012.  However, respondent had already negotiated a check payable to his law firm in the amount of $1,120.00 for attorney's fees and title insurance premiums on August 22, 2012, more than three weeks before closing and receipt of funds.  The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds.  The check payable to the law firm included $231.00 for lender's title insurance, however, respondent did not issue a title policy.

## Matter VII

Respondent was retained to conduct a home mortgage loan closing for Client F. The closing was conducted on October 17, 2012.  The lender wired the funds into respondent's trust account on October 19, 2012, to be disbursed on October 22, 2012.  However, on September 4, 2012, approximately six weeks prior to receipt of the funds for closing, respondent issued a trust account check payable to his law firm in the amount of $1,002.60 which included $442.60 for title insurance.  At the time respondent negotiated this check, funds had not been deposited into his trust account or otherwise received for this purpose.

Respondent conducted the closing as scheduled and delivered a trust account check to Client F for the excess cash.  Client F was able to negotiate the proceeds check, however, respondent failed to issue the payoff of the existing mortgage of $100,824.12.  In response to inquiries about the payoff from Client F and the new lender, respondent repeatedly made false assurances that the check had been sent. The balance in respondent's trust account dropped below the amount necessary to cover the remaining disbursement on approximately forty-nine occasions between December 31, 2012, and August 12, 2013, the date of respondent's interim suspension.  Following his interim suspension, there were insufficient funds in respondent's trust accounts to cover the payoff of Client F's existing loan.  As a result of respondent's misappropriation of Client F's loan proceeds, the holder of the existing mortgage filed a foreclosure action against Client F and the new lender on August 22, 2013.

## Matter VIII

On October 23, 2012, respondent conducted a closing on a refinance transaction for Client G.  The lender wired the loan proceeds into respondent's trust account on October 26, 2012.  However, respondent had already negotiated a check payable to his law firm in the amount of $1,263.50 for attorney's fees and title insurance

premiums on September 19, 2012, more than one month before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspension were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $713.00 for lender's title insurance, however, respondent did not issue a title policy.

## Matter IX

On November 8, 2012, respondent conducted a closing for Client H. On November 14, 2012, the lender wired $48,416.77 into respondent's trust account. Disbursements were to include $39,056.33 to pay off the existing loan and $407.00 for title insurance. Respondent did not obtain title insurance. The financial and file records respondent delivered to the Receiver upon his interim suspension were not sufficient to determine what disbursements were made. The file did contain an original, unnegotiated check written to pay of the existing mortgage.

## Matter X

On January 15, 2013, respondent conducted a closing for borrower Client I. The lender wired the loan proceeds into respondent's trust account on the day of the closing. However, respondent had already negotiated a check payable to his law firm in the amount of $1,393.20 for attorney's fees and title insurance premiums on January 14, 2013, the day before closing and receipt of funds. The check payable to the law firm included $833.20 for lender's title insurance and $100.00 for owner's title insurance, however, respondent did not issue a title policy for the lender or the client. Respondent properly disbursed the remainder of the funds.

## Matter XI

On February 8, 2013, respondent conducted a closing on a refinance transaction for Client J. The lender wired loan proceeds into respondent's trust account on February 12, 2013. However, respondent had already negotiated a check payable to his law firm in the amount of $1,142.00 for attorney's fees and title insurance premiums on February 5, 2013, before closing and receipt of funds. The financial records respondent delivered to the Receiver upon his interim suspensions were insufficient to determine whether or not respondent properly disbursed the remainder of the funds. The check payable to the law firm included $385.00 for lender's title insurance, however respondent did not issue a title policy.

## Matter XII

On February 15, 2013, respondent conducted a closing on a refinance transaction for Client K. The lender wired the loan proceeds into respondent's trust account on February 20, 2013. However, respondent had already negotiated a check payable to his law firm in the amount of $1,009.00 for attorney's fees and title insurance premiums on January 30, 2013, approximately two weeks before closing and receipt of funds. The check payable to the law firm included $349.00 for lender's title insurance, however, respondent did not issue a title policy.

## Matter XIII

On February 18, 2013, respondent conducted a second mortgage closing for borrowers Client L and Client M. The lender wired the loan proceeds into respondent's trust account on February 22, 2013. However, respondent had already negotiated a check payable to his law firm in the amount of $1,095.00 for attorney's fees and title insurance premiums on February 7, 2013, more than a week before closing and receipt of funds. The check to the law firm included $280.00 for the lender's title insurance, however, respondent did not issue a title policy for the lender or the clients.

## Matter XIV

Respondent was scheduled to conduct a closing on February 22, 2013, for Mr. and Mrs. N (Client N) who were refinancing the first and second mortgages on their home. All three loans (first and second mortgage and the new mortgage) were all from the same lender. Disbursements that were to be made included $74,596.31 for the existing first mortgage, $64,172.23 to pay off the existing second mortgage, $3,259.26 to the lender for closing costs, $16.00 to record the mortgage, $10,663.80 to Client N as excess cash, $560.00 to respondent for fees and costs, and $543.40 for title insurance.

Respondent issued a trust account check payable to his law firm in the amount of $1,103.40 on February 11, 2013, fifteen days prior to receipt of funds for the closing. At the time respondent negotiated this check, funds had not been deposited into his trust account or otherwise received for this purpose.

Respondent conducted the closing as scheduled. On February 26, 2013, respondent received $154,000.00 into his trust account by wire from the lender to fund the closing. Respondent properly disbursed the payoff of the second

mortgage and excess funds to close. He did not deliver the funds to the lender to pay off the first mortgage. The balance in respondent's trust account dropped below the amount necessary to cover that payoff on approximately twenty-six occasions between April 1, 2013, and August 12, 2013, the date of respondent's interim suspension. Respondent did not deliver the payoff of the first mortgage of $74,596.31. Following his interim suspension, there were insufficient funds in respondent's trust account to cover the payoff of Client N's existing first mortgage. Respondent did not obtain title insurance as agreed.

In April 2013, Client N contacted respondent upon discovering that their lender was continuing to draw monthly payments from their bank account for the old first mortgage. Respondent falsely informed Client N that he had paid off the mortgage and they would receive a refund of the extra payments. In June 2013, Client N again contacted respondent because payments were still being drafted from their bank account. In reliance on respondent's assurances that the problem was resolved and the drafts were improper, Client N cancelled the monthly drafts. In July 2013, the clients received a past due notice and then a delinquency notice from the lender. For the next several months, respondent continued to make false assurances to Client N and postponed scheduled meetings with them.

### Matter XV

Respondent was retained to conduct a home mortgage loan closing for Client O. The closing was scheduled for May 15, 2013, and included disbursement of $995.00 to respondent for fees and title insurance, $25.00 to the Register of Deeds to record the mortgage, $34,786.22 to pay off Client O's existing mortgage, and $15,466.93 as excess cash to Client O.

Respondent issued a trust account check payable to his law firm in the amount of $955.00 on March 28, 2013, two months prior to receipt of funds for the closing. At the time respondent negotiated this check, funds had not been deposited into his trust account or otherwise received for this purpose.

Loan proceeds related to the closing were wired into respondent's trust account on May 15, 2013. Before disbursement at the closing, the balance in respondent's trust account fell to $37,426.60 as a result of respondent's misappropriation of funds.

Respondent conducted the closing as scheduled and delivered a trust account check to Client O for the excess cash. Client O was able to negotiate the check, however,

the balance in respondent's trust account dropped below the amount necessary to cover the remaining disbursements on eight occasions between May 20, 2013, and August 12, 2013, the date of respondent's interim suspension. Respondent did not deliver the payoff to the existing lender. Respondent did not record the new mortgage. Respondent did not obtain title insurance as agreed.

## Matter XVI

On May 30, 2013, respondent conducted a refinance closing for Client P. On June 4, 2013, the lender wired the loan proceeds into respondent's trust account. However, on May 2, 2013, a month before closing and receipt of funds, respondent had already negotiated a check payable to his law firm in the amount of $1,647.30 for attorney's fees, including $1,087.30 for the lender's title insurance. Respondent properly disbursed the remainder of the funds, however, he did not issue a title policy for the lender or the clients.

## Matter XVII

On July 13, 2013, respondent conducted several real estate closings for Client Q in which Client Q received proceeds in the amount of $469,560.46. Respondent received proceeds for the purpose of holding them for the purchase of new properties. Respondent placed the funds in a 1031 exchange account, with his wife as signing agent for the Qualified Intermediary, an LLC established by his wife for this purpose.[1] On July 18, 2013, one and one-half months after notice of the first grievance was sent to respondent, respondent withdrew $51,810.00 from the 1031 exchange account and deposited it into his law firm trust account. Between July 18, 2013, and August 13, 2013, the date of his interim suspension, the balance in respondent's trust account fell below $51,810.00 on approximately three occasions. As a result of respondent's misappropriation, Client Q did not have sufficient funds to purchase the new property.

### C. Neglect of Litigation Matters

## Matter I

Respondent represented Mr. and Mrs. R (Client R) in a variety of legal matters. In 2007, Client R consulted with respondent about a dispute over a timeshare in a houseboat. On March 13, 2009, Mrs. R wrote a letter to respondent with

---

[1] Respondent's wife is a lawyer licensed to practice law in South Carolina.

information related to the ongoing dispute, enclosed a check for attorney's fees in the amount of $3,000.00, and requested that respondent "start litigation" on their behalf. Respondent did not reduce his fee arrangement regarding the timeshare litigation to writing, nor did he prepare any billing statements or time records. After receipt of the retainer, Client R continued to gather relevant information and documentation and submitted it to respondent. Respondent did not conduct any investigation, research, or settlement negotiations.

In June 2010, Mrs. R filed a disciplinary complaint against respondent alleging he had neglected the timeshare litigation and various other legal matters. Respondent filed a summons and complaint on behalf of Client R on October 8, 2010, after notice of the grievance. After filing suit, respondent took no meaningful action on behalf of Client R in connection with the timeshare litigation. He did not serve the summons and complaint or otherwise pursue the matter.

Mrs. R filed a second disciplinary complaint against respondent in August 2013 after her client file was delivered to her by the Receiver appointed upon respondent's interim suspension. Client R ultimately retained other counsel who filed a notice of dismissal of their lawsuit without prejudice pursuant to Rule 40(j), SCACR, on January 13, 2014.

On June 26, 2011, respondent signed an agreement for discipline by consent in which he admitted to neglecting the timeshare litigation to resolve the first disciplinary complaint filed by Mrs. R. Pursuant to the terms of that agreement, the Commission on Lawyer Conduct (the Commission) issued a confidential admonition on the condition respondent complete the South Carolina Bar's Legal Ethics and Practice Program Ethics School no later than September 15, 2012. Respondent did not complete the program in spite of reminder letters from Commission Counsel dated September 28, 2011, April 22, 2013, and June 26, 2013.

Matter II

In 2006, Mr. and Mrs. S (Client S) paid respondent $5,000.00 as a retainer to represent them in connection with an easement dispute with their neighbor. Respondent filed an answer for Client S and engaged in extensive discovery. The master-in-equity ruled against Client S on the plaintiff's motion for summary judgment. On October 17, 2011, respondent filed a notice of appeal on behalf of Client S in the South Carolina Court of Appeals. The Clerk's Office sent letters to respondent on November 7, 2011, December 21, 2011, and February 10, 2012,

reminding him of his obligation to request a transcript of the hearing from the court reporter and timely file proof that he had done so. On February 12, 2012, opposing counsel served respondent with a letter addressed to the Clerk of Court asserting respondent had not requested the transcript from the court reporter. On March 7, 2012, the Clerk of Court filed an order dismissing Client S's appeal for failure to order the transcript. Respondent did not file a petition to reinstate the appeal and the Clerk of Court issued a remittitur.

Respondent believed his representation of Client S was limited to defending the lawsuit and he only filed the notice of appeal to preserve his clients' rights; however, his written fee agreement contained no such limitation. Respondent admits that it was his responsibility to ensure that his written fee agreement specifically set forth the scope of his representation. Further, he admits that he was required to take steps to secure the transcript, comply with court rules, and formerly withdraw from the case.

## Matter III

On April 27, 2009, Client T paid respondent a $2,500.00 retainer to negotiate a "short sale" and conduct a closing on her property. On several occasions between April 2009 and February 2010, Client T contacted respondent for information about the status of the negotiations. Respondent made repeated assurances that he was working on getting approval of the short sale and negotiating terms with the lender. After no progress on the matter, Client T contacted her lender in February 2010 and was informed respondent had not contacted the lender about the matter at all. Client T made multiple written demands for the refund of her retainer but respondent did not comply.

## Matter IV

On August 7, 2009, Client U paid a retainer of $2,500.00 to respondent for representation in negotiating a modification of his home mortgage loan. The written fee agreement specifically limited the scope of the representation to negotiations with the lender and filing an answer in the event of foreclosure. The fee agreement called for payment of additional fees if Client U wished to retain respondent for court hearings and contested matters. For six months, respondent took no action on behalf of Client U. In October 2009, January 2010, and February 2010, Mr. U received correspondence from his lender attempting to obtain information for consideration of a loan modification. Client U forwarded

these letters to respondent. On February 5, 2010, respondent contacted Client U's lender for the first time.

On May 13, 2010, Client U's lender filed a foreclosure action. On June 14, 2010, respondent filed an answer and counterclaim on behalf of Client U and his wife. Respondent took no further action on behalf of Client U.

On March 14, 2013, Client U forwarded respondent by fax the notice of rights regarding foreclosure intervention he received from his lender. That notice advised Client U that he had thirty days to voluntary elect to participate in foreclosure intervention. Respondent did not contact the lender or Client U regarding intervention.

On April 15, 2013, Client U was served with the lender's certification of compliance confirming that it had issued notice to him, but that he failed to voluntarily elect to participate in foreclosure intervention. Client U forwarded the correspondence to respondent via fax. Respondent took no action and did not communicate with Client U about it.

The master-in-equity held a foreclosure hearing after notice to respondent as counsel of record for Client U and his wife. Respondent did not attend because Client U did not pay him any additional fees. Respondent did not move to withdraw as counsel. Respondent did not inform Client U or his wife of the hearing date or advise them about proceeding pro se.

On August 12, 2013, the Court placed respondent on interim suspension. Id. Respondent failed to notify the court or opposing counsel that he was suspended from the practice of law. On August 16, 2013, respondent was served with a copy of the order from the master-in-equity entering judgment in favor of the lender and setting a sale date for the property. On August 18, 2013, Client U learned for the first time that his house was going to be sold as a result of the foreclosure.

Matter V

On September 12, 2008, Client V paid a retainer of $2,500.00 and $325.00 in advance costs to respondent for representation in a quiet title action regarding her deceased grandfather's house. Client V's ex-boyfriend had been arrested for fraudulently selling the property by forging Client V's deceased grandfather's name to a deed. Respondent attended the hearings in the criminal matter. For nearly three years, respondent continued to assure Client V that he was pursing the quiet

title action. On April 2011, Client V wrote a letter to respondent imploring him to take some action to protect her interests and provide her with an update on the status of the matter. In fact, respondent took no action to secure the title for Client V until June 2011 when he filed a quiet title action and lis pendens. After attempting service of the lawsuit on the heirs, respondent took no further action on Client V's behalf. The court sent roster notices to respondent in April and June 2013, but respondent did not take steps to move the case to a hearing.

On August 12, 2013, the Court placed respondent on interim suspension. Id. Respondent failed to notify the court or move to withdraw as counsel in this matter.

## Matter VI

On December 7, 2009, respondent conducted a closing on a second mortgage for Mr. and Mrs. W (Client W). From the proceeds of that loan, Client W paid respondent a retainer of $2,500.00 to assist them in obtaining the satisfaction of an old mortgage from a defunct Georgia mortgage company. In the written fee agreement, respondent agreed to obtain satisfaction of the mortgage by "making a demand for satisfaction through the State of South Carolina and the State of Georgia administrative processes and, if necessary, filing a civil action in South Carolina to satisfy the mortgage."

In February 2011, respondent conducted a closing on a second home purchased by Client W. Respondent did not provide the clients with their deed. On September 1, 2011, after multiple phone calls, Mr. W sent an email message to respondent asking about the status of the mortgage satisfaction and his original deed. Respondent did not respond.

Between December 2009 and August 2013, respondent took no meaningful action to secure satisfaction of Client W's mortgage. Respondent neither made a demand through any state administrative processes nor filed a civil action on Client W's behalf.

After respondent's interim suspension in August 2013, Mr. W retained the services of new counsel who obtained the satisfaction of the old mortgage and the deed for the second home.

Respondent represented Client X in defense of a foreclosure action. On February 13, 2013, the master-in-equity issued an order in favor of the plaintiff. On February 22, 2013, plaintiff's counsel served respondent with a copy of the order by mail, fax, and email. On April 9, 2013, respondent filed a notice of appeal with the South Carolina Court of Appeals claiming he had "never received written notice" of the order. The plaintiff filed a motion to dismiss on the grounds that the notice of appeal was not timely. Respondent did not file a return.

When respondent was placed on interim suspension on August 13, 2013, the Supreme Court advised him in writing of his obligations to comply with Rule 30, RLDE, Rule 413, SCACR, which included notifying his clients and opposing counsel in pending matters of his suspension. On August 28, 2013, respondent sent a written notice of his suspension to Client X; he did not advise them of the status of the appeal. Respondent received no response from Client X and he was not contacted by substitute counsel. Respondent failed to notify the Court of Appeals of his suspension or formally move to withdraw from representation after ten days as required by Rule 30.

On October 9, 2013, the Court of Appeals dismissed Client X's appeal and, on October 20, 2013, the Court of Appeals sent the remittitur. Client X learned their appeal was dismissed when they received notice of the sale of their home.

## **Law**

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation); Rule 1.2 (lawyer shall abide by client's decisions concerning objectives of representation and shall consult with client as to means by which they are pursued); Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing client); Rule 1.4 (lawyer shall keep client reasonably informed about status of matter); Rule 1.5 (lawyer shall not charge or collect unreasonable fee; scope of representation and basis or rate of fee and expenses for which client will be responsible shall be communicated to client, preferably in writing); Rule 1.15 (lawyer shall safekeep client funds; lawyer shall deposit into client trust account unearned legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses

incurred; lawyer shall not disburse funds from an account containing funds of more than one client or third person unless funds to be disbursed have been deposited in account and are collected); Rule 1.16 (lawyer shall comply with applicable law requiring notice to or permission of tribunal when terminating representation; upon termination of representation, lawyer shall take steps to protect client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which client is entitled and refunding any advance payment of fee or expense not been earned or incurred); Rule 3.2 (lawyer shall make reasonable efforts to expedite litigation consistent with interests of client); Rule 4.1 (in connection with representation of client, lawyer shall not knowingly make false statement of material fact to third persons); Rule 8.4(b) (it is professional misconduct for lawyer to commit criminal act that reflects adversely on lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); Rule 8.4 (d) (it is professional misconduct for lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (it is professional misconduct for lawyer to engage in conduct that is prejudicial to the administration of justice). Respondent further admits he has violated the recordkeeping provisions of Rule 417, SCACR. In addition, respondent admits he did not comply with Rule 30, RLDE, Rule 413, SCACR.

Respondent also admits he has violated the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers); Rule 7(a)(5) (it shall be ground for discipline for lawyer to engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law); Rule 7(a)(6) (it shall be ground for discipline for lawyer to violate oath of office taken upon admission); and Rule 7(a)(9) (it shall be ground for discipline for lawyer to willfully fail to comply with terms of finally accepted agreement for discipline by consent).

## Conclusion

We accept the Agreement for Discipline by Consent and disbar respondent from the practice of law in this state. The disbarment shall not be imposed retroactively to the date of respondent's interim suspension. The disbarment is subject to the following conditions:

1. within one (1) year of the date of this opinion, respondent shall pay restitution to clients or on behalf of clients as specified in Appendix A;

2. within two (2) years of the date of this opinion, respondent shall pay restitution as specified in Appendix B;

3. within three (3) years of the date of this opinion, respondent shall reimburse all funds paid to clients or third parties by the Lawyers' Fund for Client Protection;

4. within three (3) years of the date of this opinion, respondent shall pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission; and

5. respondent shall complete the South Carolina Bar's Legal Ethics and Practice Program Ethics School, Trust Account School, and Law Office Management School prior to filing any petition for readmission.

Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

**TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.**

## Appendix A

| Client or Other Party | Amount Owed/Explanation |
|---|---|
| Client AA | $309.40 refund of owner's title insurance premium |
| South Carolina Federal Credit Union | $74,596.31 plus interest and penalties to satisfy Client N's mortgage (minus payments made by Client N after closing) |
| Lawyers' Fund for Client Protection | $1,110.00 overpayment of Client C closing |

| | |
|---|---|
| Client D | $201.00 refund of title insurance premium |
| Client F | attorney's fees for defense of foreclosure action |
| Bank of America/Green Tree Servicing, LLC | $100,824.12 plus penalties, interest, and attorney's fees related to payoff of Client F's mortgage |
| Client H | refund of attorney's fees; refund of recording fees, taxes, and hazard insurance premium if not already paid |
| Wells Fargo (or successor in interest) | $39,056.33 plus interest for Client H closing if not already paid |
| Client I | $100 refund for title insurance premium |
| Client N | $16.00 to record mortgage; $560.00 refund of attorney's fees; $2,308.26 for mortgage payments and late fees paid after closing |
| Client O | $25.00 to record mortgage; $660.00 refund of attorney's fees |
| Citimortgage Inc. (or successor in interest) | $37,426.60 plus interest and penalties to satisfy Client O's mortgage |
| Client Q | $51,810.00 plus interest |

| | |
|---|---|
| Client R | $3,000.00 refund of attorney's fees |
| Client T | $2,500.00 refund of attorney's fees |
| Client U | $2,500.00 refund of attorney's fees |
| Client V | $2,825.00 refund of attorney's fees |
| Mr. W | $2,500.00 refund of attorney's fees |

## Appendix B

| Client or Other Party | Amount Owed/Explanation |
|---|---|
| Chicago Title Company | attorney's fees, claims paid, and costs related to issuance of unauthorized title commitments and title insurance policies |
| Network Funding L.P. | $957.60 for title insurance - Client AA closing |
| South Carolina Federal Credit Union | $747.10 refund for title insurance - Client C closing |
| South Carolina Federal Credit Union | $478.30 refund for title insurance - Client D closing |
| South Carolina Federal Credit Union | $231.00 refund for title insurance - Client E closing |
| South Carolina Federal Credit Union | attorney's fees for defense of foreclosure action - Client F |

| | |
|---|---|
| South Carolina Federal Credit Union | $713.00 refund for title insurance - Client G closing |
| South Carolina Federal Credit Union | $385.00 refund for title insurance - Client J closing |
| South Carolina Federal Credit Union | $349.00 refund for title insurance - Client K closing |
| South Carolina Federal Credit Union | $543.40 refund for title insurance - Client N closing |
| South Carolina Federal Credit Union | $1,087.30 refund for title insurance - Client P closing |
| South Carolina Federal Credit Union | $467.80 refund for title insurance - Client FF closing |
| South Carolina Federal Credit Union | $430.00 refund for title insurance - Client BB closing |
| South Carolina Federal Credit Union | $931.10 refund for title insurance - Client CC closing |
| South Carolina Federal Credit Union | $437.00 refund for title insurance - Client DD closing |
| South Carolina Federal Credit Union | $488.00 refund for title insurance - Client EE closing |
| First Federal Bank | $407.00 refund for title insurance - Client H closing |
| Network Funding L.P. | $833.20 refund for title insurance - Client I closing |
| First Reliance Bank | $280.00 refund for title insurance - Client L and Client M closing |

Citimortgage Inc. (or successor in interest)          $37,426.60 plus interest
                                                      and penalties to satisfy
                                                      Client O's mortgage

Southcoast Community Bank                              $295.00 refund for title
                                                      Insurance - Client O closing